Filed 8/18/21  Tran v. Forge CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANTHONY TRAN,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>ANDRE LA FORGE,<br><br>    Defendant, Cross-complainant and Respondent,<br><br>APACHE TECH INC. et al.,<br><br>    Defendants and Respondents. | H044738, H044925<br>(Santa Clara County<br>Super. Ct. No. 1-12-CV-236232) |

Plaintiff Anthony Tran appeals from a civil judgment in favor of a former business partner following a bench trial.  He argues that the trial court adopted an erroneous forensic accounting which concluded that the parties' business venture operated at a substantial loss.  Tran establishes that one aspect of the accounting (the cost of assembling an LED light) is not supported by the evidence, but he fails to show prejudice from the discrepancy between the cost used in the accounting and that established by the evidence at trial.  Substantial evidence supports the remainder of the accounting, and the adjustment to the assembly cost to conform to the evidence does not change the conclusion that the business venture was not profitable.  We are also unpersuaded by

Tran's separate appeal from post-judgment orders addressing costs and sanctions. We will therefore affirm both the judgment and post-judgment orders.

## I. BACKGROUND

Anthony Tran and Andre La Forge started a business to design, manufacture, and sell LED horticulture lights. The business venture was identified as Apache Technology, LLC (Apache) in member and operating agreements effective January 4, 2010. Under the agreements, Tran and La Forge were designated as the sole members and managers of Apache. La Forge was to have sole authority concerning Apache's business activities, and Tran was to have sole authority regarding technology and product development. The venture was to be funded initially with $4,000—$2,400 from La Forge and $1,600 from Tran. Net annual profits and losses were to be shared in proportion to the initial capitalization—60 percent to La Forge and 40 percent to Tran. The members agreed that each would loan equal capital as needed to continue the venture. If either member lacked the necessary capital, he was to sign a promissory note for the amount contributed by the other at the prevailing interest rate. La Forge made several loans to the company; no corresponding promissory notes were executed by Tran.

Tran did not provide a $1,600 capital contribution as contemplated by the operating agreement. The parties ultimately agreed that Tran would develop the schematics for the LED light and transfer the ownership of the schematics to Apache in lieu of a capital contribution. Tran reverse-engineered an LED streetlight purchased in China. He made algebraic calculations to improve the heating and light angles, modified the light lenses, and directed the drawing of schematics so that the LED lights could be manufactured.

Apache hired Suba Technology Inc. to make the first version of the LED light— the AT120. Suba produced 534 lights that did not comply with Underwriters Laboratory (UL) standards. Among those lights, Apache sold approximately 30 to NASA and 128 to Stanford University. The parties agreed to work together to make their lights UL

2

compliant, but Tran became upset and argumentative when a UL representative pointed out deficiencies in his design. Tran said he was upset because he had not been paid profits despite the Stanford and NASA sales; as a result, he refused to remedy the deficiencies.

La Forge hired Greg Schlick, a plant physiologist and researcher with an interest in LED horticulture lights, to help develop a UL compliant light, and the personal and business relationships between Tran and La Forge deteriorated. Tran sent La Forge an email in March 2012 noting that Apache had failed to provide him with partnership tax forms for 2010 and 2011. He told La Forge that he would not accept liability for Apache and asked that all production be stopped. La Forge replied that Apache was shut down because the lights were too small, and La Forge had started a new company with new lights and technology.

La Forge's company, Apache Tech Inc. (ATI), hired Vander-Bend Manufacturing to make a modified version of the AT120 light. Vander-Bend manufactured a UL compliant AT120 light, and assembled two other UL compliant lights that evolved from the AT120 prototype—the AT200 and the AT600.

In late 2012 Tran sued La Forge to recover his share of business profits. The operative second amended complaint against La Forge, Apache, ATI, and a second company owned by La Forge (Advanced Technologies Innovations, Inc.)[1] alleged breach of contract (first cause of action); fraud (second cause of action); unjust enrichment (third cause of action); accounting (fourth cause of action); breach of the implied covenant of good faith and fair dealing (fifth cause of action); breach of fiduciary duty (sixth cause of action); unfair business practices (seventh cause of action); and conversion (eighth cause of action). The complaint alleged that La Forge misappropriated Tran's technology and Apache's profits in bad faith and in breach of his fiduciary duty to Tran; never intended

_____

[1] Advanced Technology Innovations, Inc. was dismissed from the lawsuit on demurrer.

3

to share profits; raided and converted to his own use Apache's assets; continued to sell Tran's technology through ATI; and refused to provide an accounting.

La Forge cross-complained against Tran. The operative cross-complaint alleged that Tran breached the implied covenant of good faith and fair dealing by failing to make capital contributions and provide promissory notes as required by the member agreement. La Forge sought an accounting, damages, and declaratory relief.

The accounting causes of action were bifurcated, and the parties mutually selected a forensic accountant to determine the profits and losses for the business venture. The parties agreed to share equally the cost of the accounting, with the court retaining jurisdiction over the ultimate allocation. The court ordered the forensic accountant to provide a report and accounting "on the following subjects for the business operations of Apache Technology, LLC or the LED light business venture between the parties for the development, manufacture, and sale of the AT120, AT200, and AT600 lights (the 'LED light business venture') from January 1, 2010 through December 31, 2015." The forensic accounting was to address all contributions made by the parties and all payments received by the parties in connection with the LED light business venture; all loans and repayment of loans made to the venture; all balance sheets for the venture; all profit and loss from the venture; and the current status of the venture. The court set deadlines for the parties to provide the accountant with requested documents, for the accountant to prepare an initial report, and for the parties to comment on that report. The accountant was to provide a final report by June 3, 2016. The accountant notified the parties that he was unable to comply with the court's order because he had received incomplete information regarding the venture. In a revised schedule, the court ordered the accountant to complete a report by June 30, and to note in that report any deficiencies attributable to insufficient information.

The accountant prepared the June 30 report, which included a balance sheet and profit and loss statement generated solely from defendants' QuickBooks data file. He

4

explained that neither document was reliable due to lack of supporting documentation. Regarding contributions to the venture, the report showed a $311,464 net balance due La Forge as of July 2015 ($423,604 contributed less $112,140 received), plus additional undocumented contributions ($181,389) in the form of business expenses paid. The report showed Tran contributed $23,845 to the venture and received $40,503 from the venture. The QuickBooks balance sheet (current through July 2015) showed accrued liabilities totaling $71,360; $356,381 in accrued equity; and a cumulative net loss of $193,116 as of December 2014.

After receiving the June 30 report and without the court's knowledge, the parties agreed to supply additional information to the accountant. The accountant's associate visited ATI's office, where he met with La Forge, Schlick, and ATI's accountant, and counted the heatsinks on the premises. (A heatsink is a component of the LED light. The AT120 and AT200 lights use one heatsink; the AT600 uses four.) La Forge provided a QuickBooks file updated through the end of 2015, all purchase invoices from the heatsink supplier, and documentation to support the $181,389 in paid business expenses. Schlick provided a more complete set of sales invoices, and a spreadsheet identifying and listing the cost of component parts and assembly for each version of the LED light. With that additional information, the accountant prepared a second report with updated findings shortly before trial.

The second report explained that based on the number of purchased heatsinks, the number of lights sold, and the physical heatsink inventory, the accountant was able to confirm that defendants' QuickBooks file had substantially captured all of the lights that had been sold. According to the sales invoices, the venture sold 445 AT120 lights, 97 AT200 lights, and 238 AT600 lights, which accounted for 1,494 heatsinks. Those heatsinks, plus 516 heatsinks in inventory and 150 heatsinks accounted for as lost, broken, or destroyed, totaled 2,160 heatsinks, which corroborated closely with the heatsink supplier's records showing 2,204 heatsinks sold to Apache. The second report

5

relied on the cost of component parts and assembly for the LED lights supplied by Schlick, which was greater than the estimate defendants' accountant had used (and entered in QuickBooks). Using Schlick's figures, the manufacturing cost increased by approximately $158,000, which resulted in less profit per light, and a $428,614 cumulative loss through December 2015. La Forge's cumulative capital contribution (verified as exceeding $600,000) was offset by the $428,614 loss, resulting in $187,978 net equity.

The court conducted a seven-day bench trial in which Tran contested the forensic accountant's findings. The court heard testimony from Tran, La Forge, the forensic accountant, Schlick, and representatives from Suba, Vander-Bend, and a third assembler. The court denied Tran's post-trial objections to the accountant's first and second reports which were admitted in evidence. In its tentative decision, the court found the venture had operated at a loss and that neither party was liable to the other.

Tran requested a statement of decision on 86 controverted issues, and submitted a proposed statement of decision consistent with the trial court's tentative findings. In an 18-page statement of decision consistent with its tentative ruling, the trial court adopted the profit and loss conclusions set forth in the accountant's second report, finding them to be reliable and accurate based on the accountant's testimony and supporting evidence, and finding that neither Apache nor ATI profited from selling LED lights from 2010 to 2015. The court granted La Forge's request for declaratory relief, ordered that Apache be dissolved, and denied all claims and remaining cross-claims for failure of proof. Judgment was entered accordingly.

By written order the court denied Tran's "Motion to Vacate and/or Amend Statement of Decision and Judgment, Alternatively, to Reconsider, Correct, and Amend the Court's Interim Order on Plaintiff's Motion in Objection to [the Forensic Accountant's] Reports Based on Fraud on the Court, and Alternatively for a New Trial and for Sanctions." The court issued an order denying Tran's motion for sanctions

6

against La Forge, ATI, and their attorney under Code of Civil Procedure section 128.5, and against the forensic accountant and Schlick under Code of Civil Procedure section 177.5. Plaintiff's motion for reconsideration and correction and for sanctions under Code of Civil Procedure section 128.7 were denied.

Tran requested more than $129,000 in costs, including over $90,000 in witness fees. Defendants sought over $70,000 in costs. Each moved the court to disallow the other's costs. The trial court granted in part Tran's motion to tax defendants' costs, resulting in an $8,264.33 award to defendants. (Defendants were not awarded their expert fees ($32,271.52) nor their 50 percent share of the forensic accountant's fees ($29,822.50)). Defendants' motion to tax costs was granted, as Tran was not a prevailing party and therefore not entitled to recover costs.

Tran timely appealed the judgment and post-judgment orders on costs, sanctions, and his motion to vacate, amend, and/or grant a new trial. We consider the appeals together.

## II. DISCUSSION

Based on purported "fraudulent false accounting" and bias on the part of the forensic accountant, Tran argues that the trial court should have corrected mistakes on the statement of decision or granted a new trial, and that this court should reallocate to defendants Tran's share of the forensic accountant's fees. Tran complains that the accountant relied on documents received in an improper manner. He challenges the accountant's calculations regarding La Forge's monetary contribution to the venture, the cost to make the AT120 light, and the number of lights sold by the venture.

An order denying a new trial motion is not an appealable order. (*Singleton v. Perry* (1955) 45 Cal.2d 489, 500.) We therefore address Tran's arguments only as they relate to the statement of decision and the order taxing costs. We review factual findings regarding the accounting for substantial evidence. " '[W]e have no power to judge [ ] the effect or value of the evidence, to weigh the evidence, to consider the credibility of the

7

witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.)  Our role is limited to determining whether the evidence before the trier of fact supports its findings.  (*Reddy v. Gonzalez* (1992) 8 Cal.App.4th 118, 123.)  (We note that Tran's failure to properly object to the trial court's statement of decision does not forfeit substantial evidence review of the findings supporting the judgment.  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59–60.))  We review the post-trial rulings on costs and sanctions for abuse of discretion.  (*LAOSD Asbestos Cases* (2018) 25 Cal.App.5th 1116, 1123; *Ellerbee v. County of Los Angeles* (2010) 187 Cal.App.4th 1206, 1217.)

To the extent trial court error is shown, reversal of the judgment is not warranted absent a showing of prejudice.  (Cal. Const., art. VI., § 13 [" 'No judgment shall be set aside, or new trial granted, in any cause, on the ground … of the improper admission or rejection of evidence, … or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice' "]; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1113.)  A miscarriage of justice may be found when the reviewing court, " 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

*Receipt of Documents*

Tran complains that the forensic accountant relied on documents received ex parte after the court's deadline for completing his report.  The trial court noted that Tran did not file a pre-trial motion to exclude the accountant's second report or request a continuance to allow for further review of its contents.  The court found that both counsel were aware of and agreed to the accountant's follow-up meeting with La Forge's accountant to obtain additional information.  The accountant testified that on a phone call

8

with both counsel he discussed meeting with ATI's accountant to obtain additional information. He explained that the purpose of the second report "was not to sandbag anybody," but to produce a report that did not suffer from incompleteness due to insufficient information. The trial court credited the accountant's effort to be precise, and his taking the initiative to collect additional information in order to produce a reliable report. We find no impropriety or miscarriage of justice in the accountant's pursuit of additional information or the trial court's receipt of the report in evidence. (Evid. Code, § 353; *Pool v. City of Oakland*, *supra*, 42 Cal.3d at p. 1069.)

*La Forge's Monetary Contributions to the Venture*

Tran argues the forensic accountant falsely reported and testified that La Forge had capitalized Apache with a $2,400 check dated November 15, 2010. His claim is not supported by the evidence. After being shown a cancelled $2,400 check at trial, the accountant acknowledged that the check (which had not been provided to him earlier) appeared to be a customer's payment for a light purchase, and that La Forge's contribution to the venture should be reduced accordingly. The accountant testified that the adjustment did not result in lack of capitalization because La Forge contributed $24,600 to the venture in September 2010, which satisfied the $2,400 capitalization required by the member agreement.

Tran complains that LaForge did not loan the venture $648,888 because that figure appears as shareholder investments to ATI on the updated balance sheet. Again, his contention contradicts the record. The accountant explained that he classified expenses paid by ATI for the benefit of Apache and money transferred from ATI bank accounts to Apache as either loans or shareholder investments attributable to La Forge, and he ultimately reclassified La Forge's cumulative loans as shareholder investments.

*Light Sales*

Apache's sales invoices showed that between 2011 and August 2016 the venture sold 445 AT120 lights, 97 AT200 lights, and 238 AT600 lights, totaling 780 units sold.

9

Tran argues those numbers are "false" because he presented evidence from three assemblers showing more than 1180 lights had been collectively assembled. The trial court's rejection of Tran's count as unreliable is supported by the evidence.

The forensic accountant testified that units assembled and shipped to Apache do not equate to lights sold to Apache customers. The assemblers did not ship assembled lights to Apache's customers. Vander-Bend's custodian of records testified that some of its builds were metal boxes only and not assembled lights. The custodian of records for the third assembler testified that his company "assembled" and "built" only heatsinks. No evidence was presented that the third assembler built fully assembled marketable lights.

The accountant explained that his primary purpose in requesting sales invoices was to cross-check the sales income reported in QuickBooks. He was confident in using the invoices provided by defendants as a reasonable estimate of the number of lights sold because the number of heatsinks corresponding to those lights (one heatsink for each AT120 and AT200 light, and four heatsinks for each AT600 light) reconciled with the number of purchased heatsinks after accounting for the number of heatsinks remaining in inventory.[2]

Tran contends the accounting was deficient because the invoice schedule attached to the second report did not include a line item matching a $28,417.50 check from Stanford University. The accountant explained that payments are not reflected in an invoice schedule, and the specific deposit was recorded in QuickBooks. The profit and loss statement used the higher sales figure reported in QuickBooks ($1,000,339) rather

[2] According to invoices provided by the venture's heatsink supplier (EDS), Apache purchased 2,204 heatsinks between August 2010 and January 2016. Apache's sales invoices showed the company sold 445 AT120 lights; 97 AT200 lights; and 238 AT600 lights between 2011 and August 2016, which would account for 1,494 of the purchased heatsinks. The venture accounted for 150 lost, destroyed, donated, or broken heatsinks, and 516 heatsinks remained in inventory. The second report thus accounted for 2,160 of the 2,204 purchased heatsinks.

10

than the sales tally generated from the invoices ($911,727). The accountant also recognized that the discrepancy between the 2,204 heatsinks purchased from EDS and the 2,160 accounted for through sales and inventory was possibly attributable to missing invoices. Tran's complaint that the accountant did not consider sales from 2010 also lacks merit, given that he relied on the higher income figure shown in QuickBooks, which included $3,020 in sales revenue from 2010. The invoice schedule is substantial evidence of lights sold by the venture, which in turn supports the gross profits realized by the venture.

### Cost of Goods Sold

Tran complains that the accountant should not have relied on the build out costs provided by Schlick shortly before trial. He focuses on the $179 cost to assemble the AT120, which was based on a quote provided by Vander-Bend in 2014. We agree that the $179 assembly cost is not supported by any evidence in the trial record. Vander-Bend stopped manufacturing the AT120 in 2013; the $179 estimate is greater than the actual AT120 assembly costs shown on the Suba and Vander-Bend invoices admitted in evidence; and there is no evidence of the venture ever paying more than $105 to assemble the AT120 light. But Tran has not shown that he was prejudiced by the discrepancy. (Cal. Const., art. VI., § 13.) Even adjusting the AT120 assembly cost downward to conform to the Suba and Vander-Bend invoices, the venture was still not profitable. The accountant concluded that the venture's cumulative loss exceeded $428,000; using the lower assembly costs for 445 AT120 lights reduces that loss by less than $50,000 and therefore does not affect the trial court's conclusion as to profitability.

### Post-Judgment Orders

Tran argues that the trial court "inappropriately" awarded costs to defendants, including those associated with answering the complaint, defendants' unsuccessful discovery and summary judgment motions, and per diem fees. Tran has not provided us with his motion to tax costs nor the reporter's transcript of the hearing on that motion.

11

He offers no authority to support his argument, and otherwise fails to show the trial court's cost award was an abuse of discretion.

We reject Tran's contention that his share of the forensic accountant's fee should be reallocated to defendants "based on false reporting and bias." The trial court found the accountant to be "competent, hard-working, fair, unbiased, thorough, credible, and correct in his analysis." The trial court noted that the accountant "considered all of the financial information provided by the parties, whether he asked for the specific information or not." The accountant "answer[ed] all questions of counsel and the court and accounted for any perceived fallacies or inconsistences … [and] was never defensive or hostile to any party or to the court." Our review of the record reveals no inconsistency with the trial court's observations. We see no impropriety on behalf of the accountant, or any basis to interfere with the trial court's allocation of expert fees.

Tran moved for monetary sanctions against defendants and their attorney under Code of Civil Procedure section 128.5; for terminating sanctions related to defendants' cross-complaint and answer; and for monetary witness sanctions against the forensic accountant and Schlick under Code of Civil Procedure section 177.5. The motion was set for hearing on May 15, 2017, but was addressed instead on April 24, along with other post-trial motions. Tran has not provided us with the reporter's transcript of that hearing. According to an order prepared by defendants' counsel, signed by the trial court and filed May 3, the requests for terminating sanctions and witness sanctions were denied. The April 24 minute order states that Tran withdrew all motions for sanctions and the motion set for May 15 was taken off calendar.

Tran complains that the order drafted by defendants' attorney was "falsely presented," "misinformed the Court," and "executed [] in error." According to Tran, no motion for sanctions was heard on April 24. At a hearing on May 18, the court denied Tran's new motion for sanctions under Code of Civil Procedure section 128.7, filed on May 15. Tran's attorney confirmed at the May 18 hearing that he had withdrawn his

12

request for sanctions under Code of Civil Procedure section 128.5, but he did not ask the court to rule on his other sanctions requests, nor did he assert that the May 15 hearing had been vacated in error, or that the May 3 order had been executed in error. Tran has thus failed to show error related to the May 3 order denying sanctions.

## III. DISPOSITION

The judgment and post-trial orders regarding costs and sanctions are affirmed. Respondents shall recover costs on appeal.[3]

---

[3] Tran's October 3, 2019 request for judicial notice is denied. The documents of which Tran seeks judicial notice came into existence after judgment was entered in this case, and they are not relevant to our review.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Danner, J.

**H044738 -** *Tran v. La Forge et al.*